## Frank Rabinovich, et al., v. Mildred Reith.

### Gen. No. 11,909.

1. INJUNCTION—*when will not be ordered.* An injunction, the granting or the refusing of which is a matter of sound discretion, will not be ordered where it will operate oppressively, or where it is not the fit and appropriate mode of redress under all the circumstances of the case, or where it will or may work an immediate mischief.

2. INJUNCTION—*when will not be granted in abridgment of the right to labor.* An injunction will not be granted so as to abridge the right to labor unless the one restrained, if permitted to labor, would irreparably damage another, or by fair contract has bound himself not to engage in a definite employment for a certain length of time.

3. PERSONAL SERVICE CONTRACT—*when equity will not enforce.* The general rule is that contracts for personal services will not be specifically enforced in equity. This rule springs out of the fact that the court, in such a case, is unable specifically to carry its decree into effect. The negative enforcement of such a contract by the use of the injunctive process of the court will not be undertaken unless the services contracted for are purely intellectual, peculiar or individual in their character, and unless further there is contained in such contract a negative provision excluding service by the defendant for the person or persons other than the complainant.

Injunctional proceeding. Appeal from the Superior Court of Cook County; the Hon. THEODORE BRENTANO, Judge, presiding. Heard in this court at the October term, 1904. Affirmed. Opinion filed May 1, 1905.

**Statement by the Court.** May 13, 1904, the parties hereto entered into the following agreement:

"This agreement is made between Rabinovich & Ogus and Mildred Reith. We agree to pay to Mildred Reith for services rendered as millinery trimmer $35 a week.

The period of employment being one year, beginning February 22, 1904.

Also pay her expenses to New York City and return after July 4, 1904.

It is also understood that she is not to receive any salary while away from the the city or not actually at work.

The hours of work being as follows: From 8 to 12 A. M. and from 1 to 6 P. M. Also three evenings a week from 7 to 9:30 o'clock P. M."

Appellee quit the employment of appellants May 25, 1904. She says she was discharged on that date, while they claim that she then quit their employ without any good or sufficient cause. Appellee remained without employment from this time until in September of that year, when she engaged with competitors in business whose store was near that of appellants. Thereupon appellants filed a bill to enjoin appellee from entering the employ of any other person until the expiration of the term of service as set forth in the foregoing contract, upon the ground that the work of designing and trimming millinery hats is an act requiring great judgment, originality and talent, and involving personal judgment and the peculiar individual taste of the artist directing the work; and the bill alleges that appellee is a person of peculiar ability and great experience in catering to the particular class of custom upon which appellants are dependent; that it would be exceedingly difficult to fill her place with any other competent designer and trimmer, and that even if a designer and trimmer were procured, having ability, the work of such substitute would be so different from the work produced by the individual and personal talent of appellee as to be a very inadequate substitute for the personal services contracted for by them.

Appellee answered, setting up her wrongful discharge, and alleging that the work of designing and trimming hats

is governed by the general fashion and not by the peculiar taste of appellee; that she entered into her new employment solely for the purpose of making a living, and that the services covered by the contract are not of such a personal and peculiar nature as to admit the interposition of a court of equity to enforce the contract, etc.

A preliminary injunction was granted. A motion was then made to dissolve the injunction, which was heard on bill, answer, replication and the affidavits submitted by the respective parties. Upon this hearing the chancellor dissolved the injunction and dismissed the bill for want of equity.

In its decree the court finds that the defendant is a person well familiar and experienced in the work of designing and trimming millinery hats, having skill and qualifications for said work and well familiar with the conditions and surroundings pertaining to complainants' business; that on May 25, 1904, the complainants discharged the defendant, and that the contract between them was then abrogated; that on the 5th day of September, 1904, the defendant engaged with competitors, located next door to the complainants' place of business; that by reason of the aforesaid discharge the complainants are not entitled to the relief prayed for.

From this decree the present appeal was perfected.

ELIJAH N. ZOLINE and HENRY RUSSELL PLATT, for appellants.

JACOB C. LEBOSKY, WILLIAM SLACK and JOHN C. WILSON, for appellee.

MR. PRESIDING JUSTICE BALL delivered the opinion of the court.

We have examined this record and are of the opinion that the finding of the learned chancellor upon the facts is sustained by the evidence. It is not necessary to set out the bill, answer and affidavits in detail. The evidence is sharply conflicting, but when carefully scrutinized it is ap-

parent that it sustains the finding that appellants in violation of the contract discharged appellee May 25, 1904.

This conclusion is sufficient to justify the affirmance of the decree appealed from; but we feel that in deference to counsel we ought to consider the propositions of law involved herein which they have so ably argued.

Appellants employed appellee as "millinery trimmer" at $35 per week. She agreed to work 61½ hours per week for that salary; and yet appellants allege that she "is an unique artist in her line of work;" and that in losing her services the damage suffered by them "is irreparable in its nature." This contract contains no negative covenants. Had appellants desired so to bind her when the contract was being considered, common fairness demanded that they get her assent thereto and then incorporate such a clause in the contract. This they did not do. The consequences which follow such omission must be borne by appellants.

It is elementary that an injunction, the granting or the refusing of which is a matter of sound discretion, will not be ordered where it will operate oppressively, or where it is not the fit and appropriate mode of redress under all the circumstances of the case, or where it will or may work an immediate mischief. 2 Story's Eq., sec. 959a, 12th ed. A court of chancery, as against the meaning of a contract, will not affix to it a negative quality and thereby import into it a covenant by implication; nor will it give its aid to one who is seeking to enforce a hard and unconscionable bargain. The general rule is that contracts for personal services will not be specifically performed in equity. This rule springs out of the fact that the court, in such a case, is unable to enforce its decree. The negative enforcement of a contract by the use of the injunctive process of the court will not be employed unless the services contracted for are purely intellectual, peculiar or individual in their character. In other cases the court leaves the party injured to his remedy at law. Chain Belt Co. v. Von Spreckelsen, 117 Wis. 106.

To support the proposition that a court of chancery will

Rabinovich v. Reith.

interpose by the writ of injunction to prevent the violation of a contract for personal services where such services involve the peculiar merits of the contracting party, or where the same performance cannot be insured by substituting another performer, or where the services of an equally skilled person are not readily procurable, appellants cite eight leading cases in England and in the United States. In each of six of these cases the contract set forth contained an express negative covenant. Also, in six of them the defendant was an actor or singer, in the seventh a surgeon, and in the eighth the defendants were acrobats.

The leading cases in England are Lumley v. Wagner, 1 DeG., M. & G. 604, and Montague v. Flockton, L. R., 16 Eq. 189. In the Lumley case, Miss Wagner, a celebrated singer, bound herself to sing at her Majesty's Theatre in London for the term of three months for 400 pounds per month; and further agreed not to sing at any other place during that period. She violated her contract and engaged to sing at Covent Garden in London. A bill was filed to enjoin her. The Chancellor, Lord St. Leonards, relying upon the negative condition in the contract, granted the injunction. He said: "I may at once declare that if I had only to deal with the affirmative covenant of the defendant, J. Wagner, that she should perform at her Majesty's Theatre, I should not have granted any injunction."

As carefully guarded as is this decision, it has not escaped criticism. In Whitewood v. Hardman, 2 Chy. Div. (1891) 428, Sir Nathaniel Lindley, speaking for the Court of Appeal, said: "I confess I look upon Lumley v. Wagner rather as an anomaly to be followed in cases like it, but an anomaly which it would be very dangerous to extend. I make that observation for this reason, that I think the court, looking at the matter broadly, will generally do much more harm by attempting to decree specific performance in cases of personal service than by leaving them alone; and whether it attempted to enforce these contracts directly by a decree for specific performance, or indirectly by an injunction, appears to me to be immaterial."

In the Montague case Flockton, an actor, entered into
a contract to perform for a certain period at the Globe
Theatre in London.   Before the expiration of that con-
tract he proposed to act at the Crystal Palace.  An appli-
cation was made for an injunction.   It was granted, not-
withstanding the contract contained no negative clause
forbidding him to perform elsewhere.   In deciding the case
Vice Chancellor Malins said:   " There is no doubt what-
ever that the proper construction of these contracts is, that
where a man or woman engages to perform or sing at a
particular theatre for a particular period, that involves the
necessity of his or her not performing or singing at any
other during that time."   This case is reviewed in Whit-
wood v. Hardman, *supra*, and is disapproved, Sir Na-
thaniel Lindley declaring that the whole judgment pro-
ceeded upon some misapprehension of the decision of Lord
St. Leonards in the Lumley case.

In Fox v. Scard, 33 Beav. 327, a demurrer was filed to
a bill which set up that Fox, a surgeon at Weymouth, had
hired Scard, a surgeon, as an assistant at a salary, Scard
agreeing that he would not carry on the business of a
surgeon within Weymouth or within twelve miles thereof
without the consent of Fox, etc.   Fox discharged Scard,
and the latter then began to practice in Weymouth on his
own account.   Sir John Romilly, Master of the Rolls, said:
" The defendant has, for a valuable consideration, entered
into an engagement not to practice at Weymouth, which
he is bound to perform, and if the facts alleged be true,
the plaintiff is entitled to relief in this court.   The de-
murrer must therefore be overruled."

In McCaull v. Braham, 16 Fed. R. 37, the defendant,
known as Lillian Russell, agreed with McCaull to act for
him in comic opera during the season of 1882-3, at a stipu-
lated salary; she agreeing not to act elsewhere or for any
one else during the life of her engagement.   McCaull filed
a bill to enjoin her from singing during the lifetime of
that contract in any other place than at the plaintiff's
theatre, which the bill alleges she is about to do.   A pre-

liminary injunction was obtained. The injunction upon argument was continued, the court saying : " Contracts for the services of artists or authors of special merit are personal and peculiar ; and when they contain negative covenants which are essential parts of the agreement, as in this case, that the artists will not perform elsewhere, and the damages, in case of violation, are incapable of definite measurement, they are such as ought to be observed in good faith and specifically enforced in equity. That violations of such covenants will be restrained by injunction, is not the settled law of England."

While the rule in England may be that the court will import into the contract a negative condition where it is fairly to be implied from the contract, in the case of actors, singers, artists and other professional workers, where the contract stipulates for special, unique or extraordinary personal services by a·party possessing such qualifications, the trend of American decisions is that even in such cases the court will not interfere unless there is an express stipulation forbidding service elsewhere. Pom. Eq. Jur., sec. 1343; Strobridge v. Crane, 12 N. Y. Sup. 898; Burton v. Marshall, 4 Gill, 487; Butler v. Galletti, 21 How. Pr. 465; Cort v. Lassard, 18 Ore. 221; Welty v. Jacobs, 171 Ill. 624.

In Welty v. Jacobs, *supra*, Welty filed a bill, based upon a written contract, to enjoin Jacobs from hindering appellant from taking possession of the Alhambra Theatre, its appurtenances and stage property, and from hindering him from producing a play there in accordance with said contract, and enjoining appellees from using said theatre during said period of seven days, and from refusing to furnish appellant necessary light, music, etc. A preliminary injunction granted was set aside on hearing, and the bill was dismissed. The Supreme Court upon appeal say that the question is whether Welty's bill of complaint can be sustained, or he should be remitted to his action at law. "Negative covenants not to sing or perform elsewhere at a certain time than a designated place have been enforced by the injunction process, but further than this such contracts

have not been specifically enforced by the court's injunction or otherwise. (Lumley v. Wagner, 1 DeG., M. & G. 604; Daly v. Smith, 38 N. Y. Sup. 158.) In Lumley v. Wagner there was an express covenant not to sing elsewhere than at complainant's theater, and the injunction was placed on that ground." * * * "Before a contract will be specifically enforced there must be mutuality in the contract, so that it may be enforced by either, and as this contract was of such a nature that it could not have been specifically enforced by appellee Jacobs, it should not be enforced by appellant."

In Cort v. Lassard, 18 Ore. 221, it was sought to prevent certain acrobats from performing at another theatre than the one named in their contract, which contained a negative condition. After a full discussion of the authorities the court says: "It results, then, that if the services contracted for by the plaintiff to be rendered by the defendants were unique or extraordinary, involving such special merit or qualifications in them as to make such services distinctly personal and peculiar, so that in case of a default by them, the same or like services could not be easily procured, nor be compensated in damages, the court would be warranted in applying its preventive jurisdiction and granting relief; but otherwise, or denied, if such services were ordinary, and without special merit, and such as could be readily supplied or obtained from others without much difficulty or expense." And finding that the defendants were ordinary acrobats, the action of the trial court in dismissing the bill was sustained.

The principle which lies at the foundation of the exercise of the injunctive process of the court is the inability of the law to afford adequate redress. It is not sufficient to entitle the complainant to this relief that he allege irreparable damage. He must aver facts from which, if true, the court can fairly draw that conclusion. If the services of another person who can substantially fill the vacated place can be obtained, appellants are not entitled to the exercise of this exceptional jurisdiction. We have been

Rabinovich v. Reith.

presented with no case where an employee in a mechanical or commercial business, not standing in a fiduciary relation to his employer, in the absence of a negative covenant, has been restrained from working for a competitor; and finding none in a somewhat extended research, we assume that no well-considered case of that character exists. On the contrary, we find that an injunction will not be granted to restrain a breach of contract by a baseball player (American v. Harper, 54 Cent. L. J. 449; Columbus v. Riley, 25 Weekly L. B. 385), an insurance agent (Burney v. Ryle, 91 Ga. 701), an expert machinist (Chain Belt Co. v. Von Spreckelsen, 117 Wis. 106), acrobats (Cort v. Lassard, 18 Ore. 221), a collector (Sternberg v. O'Brien, 48 N. J. Eq. 370), and a lithographer (Strobridge v. Crane, 12 N. Y. Sup. 898).

In this case appellants are not seriously seeking to compel appellee to return to her place that they filled soon after her departure. What they seek to do is to prevent her from working for a competitor. The effect of making permanent the injunction prayed for would be to compel her to go back to appellants under relations now strained to the uttermost, or else to remain idle; and thus, if dependent upon her labor for a support, she must beg her bread or live upon the charity of friends.

Appellants ask us to prevent appellee from trimming hats for any other person or from doing business in a city of two million people. When we reflect that among the most valuable rights one possesses is the right to labor, and that this right is also a public duty, it is manifest that by reversing this decree we would destroy more than we would preserve, and would do more injustice than justice. We will not abridge the right to labor unless the one restrained, if permitted to labor, would irreparably damage another, or by fair contract has bound himself not to engage in a definite employment for a certain length of time. Allgeyer v. Louisiana, 165 U. S. 578, 589; Marks v. Watson, 67 S. W. Rep. 391, 395.

In this case appellee never agreed that she would not work for some other employer during the life of her en-

gagement with appellants. All the conditions of the contract are affirmative. Notwithstanding the laudatory statements in their bill, appellants did not hire appellee as an artist or even as a designer, but as a " millinery trimmer " only. That women in this line of employment are many in this great city is shown by the affidavit of Martin Ascher, put in evidence in support of the bill, by which it appears that he " has employed during the year about two hundred different designers and trimmers."

We find nothing unique or extraordinary in this employment of trimming hats. It is undoubtedly true that appellee is well skilled in her work, but that work is largely mechanical and must follow the prevailing fashion to be acceptable to purchasers. It does not appear that the loss of her services inflicts irreparable damage upon appellants.

For the reasons stated the decree of the Superior Court is affirmed.

*Affirmed.*

ADAMS, J.: I concur in the *decision* of the cause.